Opinion issued November 18, 2010.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00228-CV

———————————

J. Eddie Dyer, Appellant

V.

Ronald
Cotton, Appellee



 



 

On Appeal from the 506th District Court

Grimes County, Texas



Trial Court Case No. 30355

 



O P I N I O N

In this trespass to try title suit,
Eddie Dyer sued Ronald Cotton, claiming that, in addition to procuring an
undivided 1/7th interest to farmland in Grimes County by conveyance, he also had
acquired title to the remaining 6/7th interest by adverse possession.  A jury disagreed, finding that Dyer had not
adversely possessed the property, and the trial court signed a take-nothing
judgment against Dyer.  On appeal, Dyer
contends that no legally or factually sufficient evidence supports the jury’s
finding that Dyer had failed to acquire title to the farmland by adverse
possession.  He further contends that the
trial court erred by (1) including a jury instruction requiring Dyer to
establish ouster of his other co-tenants to prove adverse possession; (2) allowing
evidence of other adverse possession and property dispute lawsuits in which
Dyer was involved; and (3) allowing the testimony of a witness whom Cotton
did not properly disclose during discovery and whose testimony violated the
parol evidence rule.  We conclude that
sufficient evidence supports the jury’s verdict and that the trial court did
not abuse its discretion in its jury instructions or evidentiary rulings.  We therefore affirm.

Background

Carrie Venters owned 46.646 acres
of farmland in Grimes County.  When she died
intestate in 1958, the property passed to her seven children in equal,
undivided interests under the laws of succession.  A house stood within a thirty-two-acre wooded
area on part of the property.  Another
approximately eleven-acre portion was cleared and used for grazing and
farming.  The property also had a tank
pond, which a nearby church periodically used for baptisms.  An old, three-strand, barbed-wire fence
surrounded the property.  

During his lifetime, Carrie Venters’
son, Lee “Snap” Venters, used the property for growing hay and grazing
cattle.  Snap repaired the old fence when
it broke through.  He also harvested
timber from the property.  His siblings
occasionally visited the property to hunt and fish.  

During the 1970s, Snap became
acquainted with Dyer when Dyer bought a tract of land next to the Venters
property.  Snap allowed Dyer’s cattle to
graze on the property and let Dyer gather hay from the property.  According to Snap’s daughter, Brenda Miller,
Snap “and Mr. Dyer were friends; and if he needed to go buy something, Mr. Dyer
would help him with it; and he would pay him back.”  It was not unusual for Snap’s children to see
Dyer’s cattle running together with Snap’s cattle on the property.  When part of the fence came down, Snap and
Dyer worked together to repair it.  In
the early 1990s, Snap and Dyer traded some property, which allowed Dyer to
build a road through the property so that he could drive to his house from the
main road.  Later, when Snap became ill
and could not check on his cattle as often as he used to, Dyer tended to them
and fed them.  

Meanwhile, Angeline Keel, Snap’s
sister and a co-tenant, died intestate in 1981. 
Her undivided 1/7th interest in the property passed to her daughter, Carrie
Young.  Young sold her interest to
individuals outside the Venters family, Roy Godwin and Jack Baker.  In 1986, Godwin conveyed his portion of the interest
to Baker, so that Baker held the entire 1/7th undivided interest.  

After Snap’s death in 1994, Dyer
bought Baker’s interest in the property. 
Despite the fact that Baker held only a fractional interest, however,
the special warranty deed he executed purported to convey the entire Venters property
to Dyer.  Baker testified that, before
the conveyance, he informed Dyer that he did not own a fee interest in the
property and was therefore selling only what he owned—what had been Carrie
Young’s undivided 1/7th interest.  The
special warranty deed from Baker to Dyer stated “That we, JACK W. BAKER and
wife, JACQUELYN V. BAKER . . . do Grant, Sell and Convey
unto EDDIE DYER . . . all of the following described real
property in Grimes County, Texas, to-wit: 
[description of the Venters property].” 
The deed expressly reserves a mineral interest in Baker, but does not
mention that he held only a 1/7th interest in the surface estate.  Over twelve years later—shortly before
trial—Baker learned of the mistake in the deed. 


Also after Snap’s death, Dyer called
and wrote Miller asking if he could purchase the interest in the property she
had inherited from her father.  In turn,
Miller’s sister, Myrtle Hatchett, then called Dyer to introduce herself, and
Dyer asked if he could buy her interest. 
Hatchett responded to Dyer’s inquiry to her that she couldn’t because it
was undivided land.  

Throughout this period, the Venters
heirs continued to visit the property, but as they advanced in years, they did
not visit as often as in the past.  Snap’s
sister, Birdetta Edwards, visited to gather firewood from the property and fish
in the tank pond about four or five times a year.  On one of those visits, Edwards installed
locks on the gate, but she found them cut off on her next visit.  On later visits, she found the old fence had
been replaced with a four-strand barbed wire fence and that someone had removed
the gate.  She crawled through the fence
to enter the property.  Dyer never forbid her to go on the
property, or told her that she was a trespasser.  She never saw a “no trespassing” sign on the
property.  

Miller heard from her Aunt Birdetta
that Dyer had stopped people from entering the property, but she visited about
twice a year without a problem.  Dyer
never communicated with Edwards regarding the gates to the property, nor did he
tell Ruby Hunter, another of Snap’s sisters, that she could not cut timber on
the property.  Miller disagreed with Dyer
that the land had physically changed since her father had owned a part of it.  Dyer never indicated to her that he claimed
the entire property as his own to the exclusion of the other individual
interests.  Hatchett agreed with Miller
and Edwards on the property’s appearance. 
She observed that the land always had been used for growing hay and cattle
grazing.  Hatchett and her son walked around
the property once or twice a year since Snap’s death, and they never had
trouble entering it.  The gate had a
chain and a lock hanging on it, but it was unlocked when she visited, and she
freely entered.  Hatchett, like her
sister, stated that it never looked as though Dyer was attempting to claim the
property as his own, and none of the Venters heirs were concerned about this
possibility.  

Birdetta assumed responsibility for
paying the family’s taxes on the property. 
Dyer acknowledged that he paid taxes on a fractional undivided interest
and understood that the other co-tenants paid the remainder of the taxes owed
on the property.  

In 2005, Ronald Cotton approached
the Venters heirs concerning his interest in buying the property.  He visited the property with Edwards several
times.  Cotton did not see any “no trespassing”
signs, and they had no trouble entering the property.  They slipped through the fence and walked the
property while Edwards pointed out the barn, the pond, the old homestead, and
the wooded area.  Edwards informed Cotton
that Dyer held an interest in the property, and that they were able to convey
only their 6/7th interest to him.  

Before buying the property, Cotton
visited it with a surveyor.  As they
examined an area near Dyer’s barn that adjoined the Venters farmland, Dyer’s
wife noticed them and told them that they could not survey the property.  In a separate incident, Dyer’s wife
confronted a different set of surveyors, who left when she called the sheriff’s
department.  Dyer’s daughter photographed
yet another group of surveyors Cotton hired that walked in the hayfield on the
property.  Cotton ultimately demonstrated
to the sheriff’s department that he had permission to enter the property, and
he completed the survey.  

In connection with the proposed
purchase, Cotton consulted Bonnie Armstrong, the owner of Navasota Abstract and
Title Company and Grimes County Title, to conduct a title search and provide title
insurance.  Armstrong informed Cotton
that, due to the deed from Baker, Dyer owned a 1/7th interest in the property.  Although nothing indicated to Armstrong that
Dyer owned more than that interest or was attempting to gain title to the
entire property through adverse possession, she included an exception in the
title insurance policy relating to Dyer’s claim.  She warned that Dyer might assert a
possessory claim to the 6/7th interest.  Cotton nevertheless purchased the 6/7th
interest from the Venters heirs.  

At trial, Dyer contended that he
was entitled to claim title under the ten-year adverse possession statute
because he started possessing and continuously using the property in 1994.  The jury found that Dyer did not adversely
possess the Venters estate, and the trial court entered judgment on the jury’s
verdict.

Discussion

I.       Adverse possession 

          A.      Standards
of review

Dyer contends that he established
adverse possession as a matter of law, and that no evidence or factually
insufficient evidence supports the jury’s finding that Dyer did not adversely
possess the property.  Because Dyer attacks
the evidentiary sufficiency of an adverse jury finding on which he had the
burden of proof, he must demonstrate that the evidence conclusively
establishes, as a matter of law, all facts in support of the issue, or,
alternatively, that the jury’s adverse finding is against the great weight and
preponderance of the evidence.  See Sterner v. Marathon Oil Co., 767
S.W.2d 686, 690 (Tex. 1989); Cain v. Bain,
709 S.W.2d 175, 176 (Tex. 1986); Harris
County v. Vernagallo, 181 S.W.3d 17, 29 (Tex. App.—Houston [14th Dist.]
2005, pet. denied).  

We view the evidence in the light
most favorable to the verdict, crediting favorable evidence if reasonable
jurors could, and disregarding contrary evidence unless reasonable jurors could
not.  See
Del Lago Partners v. Smith, 307 S.W.3d 762, 770 (Tex. 2010).  The evidence is legally sufficient if it
would enable reasonable and fair-minded people to reach the verdict under
review.  Id. 

In a factual sufficiency review, we
consider, weigh, and examine all of the evidence that supports or contradicts
the jury’s determination.  Dow Chem. Co. v. Francis, 46 S.W.3d 237,
242 (Tex. 2001); London v. London,
192 S.W.3d 6, 14–15 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).  We set aside the verdict only if the evidence
that supports the jury’s finding is so contrary to the overwhelming weight of
the evidence as to be clearly wrong or unjust.  Cain,
709 S.W.2d at 176; Nip v. Checkpoint
Sys., Inc., 154 S.W.3d 767, 769 (Tex. App.—Houston [14th Dist.] 2004, no
pet.).  We defer to the jury’s findings
on contested evidence—the jury may believe one witness and disbelieve another,
and it may resolve inconsistencies in any testimony.  Eberle
v. Adams, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st Dist.] 2001, pet.
denied).

Dyer also complains of error in the
trial court’s instruction to the jury. 
We review that issue before considering his evidentiary challenge so
that we can measure the evidentiary sufficiency against the correct
standard—either the jury charge as actually submitted, which Dyer claims was
defective, or against the charge that the trial court should have submitted.  See
Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000).  

In a jury trial, the trial court
shall submit “such instructions and definitions as shall be proper to enable
the jury to render a verdict.”  Tex. R. Civ. P. 277.  A valid instruction (1) assists the jury, (2)
accurately states the law, and (3) finds support in the pleadings and
evidence.  Union Pac. R.R. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002).  The trial court has considerable discretion
in deciding whether a proposed instruction is necessary and proper to submit to
the jury.  State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451–52 (Tex. 1997); City of The Colony v. N. Tex. Mun. Water
Dist., 272 S.W.3d 699, 746 (Tex. App.—Fort Worth 2008, pet. dism’d)
(“Indeed, a trial court is afforded even more discretion when submitting
instructions than when submitting questions.” (citing Wal-Mart Stores, Inc. v. Middleton, 982 S.W.2d 468, 470 (Tex.
App.—San Antonio 1998, pet. denied))). 
We will not disturb the trial court’s decision on which instructions to
submit to the jury absent an abuse of discretion.  McCarthy
v. Wani Venture, A.S., 251 S.W.3d 573, 584 (Tex. App.—Houston [1st Dist.]
2007, pet. denied).  If the trial court
submits an incorrect jury instruction, we reverse only if the record shows that
the given instruction was reasonably calculated to, and probably did, cause the
rendition of an improper judgment.  Bed, Bath & Beyond, Inc. v. Urista,
211 S.W.3d 753, 757 (Tex. 2006) (citing Reinhart
v. Young, 906 S.W.2d 471, 473 (Tex. 1995), and Tex. R. App. P. 61.1(a)). 


B.      Law of adverse possession

Adverse possession is the “actual and
visible appropriation of real property, commenced and continued under a claim
of right that is inconsistent with and is hostile to the claim of another
person.”  Tex. Civ. Prac. & Rem. Code Ann. § 16.021(a) (Vernon
2002).  To prove adverse possession, a
claimant must establish six elements: 
(1) actual possession of the disputed property, (2) that is open and
notorious, (3) that is peaceable, (4) under a claim of right, (5) that is
adverse or hostile to the claim of the owner, and (6) consistent and continuous
for the duration of the statutory period. 
Glover v. Union Pac. R.R., 187
S.W.3d 201, 213 (Tex. App.—Texarkana 2006, pet. denied); see also Rhodes v. Cahill, 802 S.W.2d 643, 645 (Tex. 1990).  In this case, the appropriate statutory time
period is ten years.  Tex. Civ. Prac. & Rem. Code Ann.
§ 16.026(a) (Vernon 2002).  To
establish adverse possession under this statute, the claimant must demonstrate
that he actually and visibly appropriated the land for ten or more consecutive
years, such that his use of the land gives the true owner notice of the hostile
claim.  Rhodes, 802 S.W.2d at 645; see
also Masonic Bldg. Ass’n v. McWhorter, 177 S.W.3d 465, 472 (Tex.
App.—Houston [1st Dist.] 2005, no pet.) (“The test for hostility is whether the
acts performed by the claimant on the land and the use made of the land were of
such a nature and character as to reasonably notify the true owner of the land
that a hostile claim was being asserted to the property.”).  The possession of the land must “indicate
unmistakably an assertion of a claim of exclusive ownership in the
occupant.”  Rhodes, 802 S.W.2d at 645 (quoting Rick v. Grubbs, 214 S.W.2d 925, 927 (Tex. 1948)).  If “no verbal assertion of claim to the land
[is] brought to the knowledge of the landowner, the adverse possession must be
so open and notorious and manifested by such open or visible act or acts that
knowledge on the part of the owner will be presumed.”  Orsborn
v. Deep Rock Oil Corp., 267 S.W.2d 781, 787 (Tex. 1954).

“[A] co-tenant may not adversely possess
against another co-tenant unless it clearly appears he has repudiated the title
of his co-tenant and is holding adversely to it.”  King
Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750 (Tex. 2003) (citing Todd v. Bruner, 365 S.W.2d 155, 156
(Tex. 1963)).  Whether there has been a
repudiation of a non-possessory co-tenant’s title generally is a question of
fact, but when the pertinent facts are undisputed, repudiation may be
established as a matter of law.  Id. 

C.      Jury instruction 

Dyer contends that the trial court
erred by instructing the jury that Dyer had to prove that he ousted his fellow co-tenants
or otherwise repudiated the co-tenancy relationship to establish his claim for adverse
possession.  At trial, Dyer timely objected
to this instruction:

You are further instructed that the
possession by an owner of an interest in property will be presumed to be his
right as a co-owner.  The possession, to
be adverse to the other owner, or owners, must be of such acts as to amount to
an ouster of the other owner, or owners, and must be of such an unequivocal
nature and so distinctly hostile to the others’ rights that the intention to
claim the property is clear and unmistakable.

Dyer claims that the deed from Baker, which
purported to convey the entire fee simple estate to Dyer, and not his actual 1/7th
interest, amounted to a repudiation of the co-tenancy relationship as a matter
of law, relieving Dyer of the requirement to prove ouster to establish adverse
possession.  Relying on Evans v. Covington, 795 S.W.2d 806 (Tex.
App.—Texarkana 1990, no writ) and Easterling
v. Williamson, 279 S.W.2d 907 (Tex. Civ. App.—Dallas 1955, no writ), Dyer
contends that, by claiming title in a conveyance that purported to convey the
entire title to him—a
conveyance that went unchallenged for the length of the statutory period—the
co-tenancy relationship ceased to exist, and he was entitled to take actual
title through adverse possession.  See Evans, 795 S.W.2d at 806; Easterling, 279 S.W.2d at 909.

In Evans, the Texarkana court of appeals affirmed a judgment rejecting
an adverse possession claim.  795 S.W.2d
at 808.  The appellate court noted that
the unsuccessful claimant did not oust the other co-tenant from the property,
observing that “an exception would apply” if he had entered into possession as
a trespasser before obtaining deeds from the co-owners, or had procured
conveyances purporting to convey the entire title to the land.  Id.  As support for that observation, the
Texarkana court cited Republic Production
Co. v. Lee, 121 S.W.2d 973 (Tex. 1938). 
Lee involved an adverse
possession claim brought against a widower by his deceased wife’s mother and four
surviving siblings, who, unaware that the widower had any claim to ownership,
had partitioned the land into five parts.  121 S.W.2d at 977.  Lee recites
the rule that a partition by two or more co-tenants, when followed by exclusion
of a fellow co-tenant, “constitutes a complete and unequivocal repudiation of
the co-tenancy relationship.”  Id. 
But Lee does not hold that a
deed purporting to convey an interest greater than that held by the co-tenant
is sufficient, standing alone, to prove adverse possession.  There, the siblings fenced and built
residences on the tracts, and they claimed and exclusively held the properties
continuously for more than twenty years.[1]  See id.  And Evans
did not deviate from that position, reflecting that the record showed
conflicting evidence of repudiation, as well as acts and possession consistent
with the existence of the co-tenancy. 
795 S.W.2d at 808.  

In Easterling, the Dallas court of appeals likewise applied the rule
that a co-tenant claiming through adverse possession bears the burden to show
not only actual possession, but an ouster of the co-tenant not in
possession.  279 S.W.2d at 909.  It does not support Dyer’s position that he
may prevail as a matter of law on his adverse possession claim simply by recording
an erroneous special warranty deed from Baker.[2] 

          Other
pertinent authority undermines Dyer’s position. 
First, co-tenants are not agents; a co-tenant may not convey more than
his interest in the shared property.  See Thomas
v. Sw. Settlement & Dev. Co., 123 S.W.2d 290, 297 (Tex. 1939) (“A deed
by one co-tenant purporting to convey the entire interest in a part of the
commonly owned land conveys such interest, and only such interest, in the land
as the maker of the deed possesses.”); Home
Owners’ Loan Corp. v. Cilley, 125 S.W.2d 313, 316 (Tex. Civ. App.—Amarillo
1939, writ ref’d) (declaring that co-tenant, in dealing with third persons
under ordinary circumstances, may not bind another co-tenant through any act in
relation to common property, and conveyance by co-tenant purporting to convey
entire property interest conveys only interest possessed by grantor and is
ineffective as conveyance of interest owned by non-joining co-tenant); see also Keels v. Keels, 427 S.W.2d 913, 916 (Tex. Civ. App.—Tyler 1968, no
writ) (“[T]he mere recording of a deed to a claimant who initially entered into
possession as a permissive user is no evidence of an adverse holding or the
repudiation of the tenancy.” (citing Udell
v. Peak, 7 S.W. 786 (Tex. 1888)).  Second,
a deed puts co-tenants on constructive notice of an adverse claim only if it is
on record before they acquire their interests. 
The recordation of a deed after the other co-tenants have already
acquired their property interests does not put those co-tenants on constructive
notice that their co-tenant claimed an adverse interest.  Spiller
v. Woodard, 809 S.W.2d 624, 627 (Tex. App.—Houston [1st Dist.] 1991, no
writ).  “[R]ecord notice goes forward,
not backwards.”  Id.  Here, Dyer does not
contend that he adversely possessed the land against Cotton’s right to it, but
instead against the right of Cotton’s predecessors in title, who acquired title
before the Baker conveyance to Dyer.  The
deed thus does not relieve Dyer of his burden to prove his adverse possession
claim according to the usual stringent, fact-intensive standard.

          Because
co-tenants to an undivided estate have an equal right to “enter upon the common
estate and a corollary right to possession,” a co-tenant seeking to establish
title by adverse possession must prove, in addition to the usual adverse
possession requirements, an ouster of the co-tenant not in possession or a
repudiation of the co-tenancy relationship. 
Byrom v. Pendley, 717 S.W.2d
602, 605 (Tex. 1986); see Todd, 365 S.W.2d at 160; Rep. Prod. Co., 121 S.W.2d at 977.  “Possession by one co-tenant, or by one
claiming under a co-tenant, is not sufficient to give notice of a claim by that
co-tenant adverse to the interest of the other co-tenant.”  Gibralter
Sav. Ass’n v. Martin, 784 S.W.2d 555, 559 (Tex. App.—Amarillo 1990, writ
denied) (citing, among other cases, Harris
v. Strawbridge, 330 S.W.2d 911, 920 (Tex. Civ. App.—Houston 1959, writ
ref’d n.r.e.)).  The additional
requirement of proving ouster or repudiation of the co-tenancy relationship exists
because exclusive use and possession of the property for long periods of time
is common in a co-tenancy relationship and usually occurs “with the
acquiescence of the other co-tenants.”  Todd, 365 S.W.2d at 159.  The “real property statutes of limitations as
to co-tenants are not designed to run in secrecy and silence”; therefore, the
claimant must prove actual or constructive notice of the ouster, and the clear,
unequivocal and unmistakable repudiation of the common title.  Id.
at 160; Glover, 187 S.W.3d at 215.

A party may demonstrate notice of
the repudiation of the co-tenancy relationship by circumstances, and the jury
may infer such facts “from long continued possession of the land under claim of
ownership and non-assertion of claim by the owners.”  Todd,
365 S.W.2d at 589; see also Glover,
187 S.W.3d at 215 (noting that claimant can establish constructive notice by
(1) long-continued possession or (2) change in use or character of possession).

The law and the evidence that we
next discuss support submission of the challenged instruction.  We therefore hold that the trial court did
not abuse its discretion in instructing the jury on the requirement of ouster.

D.      Evidentiary challenges

          1.       Legal
sufficiency

          With
respect to the legal sufficiency of the evidence, the jury reasonably could
credit the testimony of the various Venters heirs, who explained that Snap had
a friendly and neighborly relationship with Dyer, had allowed Dyer to graze his
cattle on and collect hay from the property, and had his assistance in making
repairs to the fence and other chores even before Dyer had any ownership
interest in the property.  The heirs
described their regular visits to the property, noting that the property’s use
generally remained the same from before Snap’s death through to the
present.  With Snap’s and the other
co-tenant’s permission, and then through his own rights as a co-tenant, Dyer
used the property in a manner consistent with those rights.  See
Radford v. Garza, 586 S.W.2d 656, 662 (Tex. App.—Corpus Christi 1979, no writ)
(determining that owner and claimant who entered property with owner’s consent
created landlord-tenant relationship even though claimant was not required to
pay rent, so that owner was justified in assuming claimant’s use of premises
was permissive and in recognition of his title; manifestation of adverse
possession under circumstances “must be so notorious that it is not susceptible
of explanation consistent with the existence of the landlord-tenant
relationship”); Cleveland v. Hensley,
548 S.W.2d 473, 475 (Tex. App.—Texarkana 1977, no writ) (declaring that once
landlord-tenant relationship is established, tenant’s possession will not be
considered adverse to owner unless tenant (1) repudiates relationship and then
asserts claim of right adverse to owner, and (2) gives notice of such
repudiation and adverse claim to owner). 
The heirs, as well as Cotton, testified that they did not see any “no
trespassing” signs posted on the property, entered the property without
difficulty, and never had heard Dyer prohibit them from coming onto the
property or claim it for his exclusive use. 
Snap’s daughters both testified that, after their father’s death, Dyer
asked if they would convey their property interests to him, a request that is
inconsistent with the assertion of an exclusive property right.  

          The
evidence creates a fact issue as to whether Dyer adversely possessed the
property, one that the jury was entitled to resolve based on the credibility of
the witnesses and the quality and quantum of evidence presented by each
side.  Because Dyer has not shown that
the evidence compels a finding that he adversely possessed the property as a
matter of law, we do not disturb the judgment on this ground.  See Dow
Chem. Co., 46 S.W.3d at 241 (holding that party which attacks legal
sufficiency of adverse finding when it had burden of proof on issue must
demonstrate that evidence establishes, as matter of law, all vital facts in
support of issue); One Ford Mustang v.
State, 231 S.W.3d 445, 449 (Tex. App.—Waco 2007, no pet.). 

                    2.       Factual sufficiency

          In
contending that the jury finding of no adverse possession is against the great
weight and preponderance of the evidence, Dyer points to the following
evidence:

·       
Dyer regularly put as many as 75 branded cattle and 25 horses on the
property to graze;

 

·       
Dyer regularly produced hay on eleven acres on the east side of the
property;

 

·       
In 1995, Dyer tore down the old fence and built a new, stronger fence
around the property;

 

·       
Dyer used large machinery on the property to build the gate and handle
the hay farming operations;

 

·       
Dyer added a locked gate to the county road and two gates opening to his
contiguous property;

 

·       
Ranch hands, dog trainers, and neighbors who frequently used the land
with Dyer’s permission testified that they never saw anyone on the property
other than Dyer, his family, employees, and guests; and

 

·       
In 1999, Dyer told a forester hired by Venters heirs that he could not
cut timber on the property and showed him his deed to the property.  

These facts do not support Dyer’s
contention.  His use of the land for
grazing and collecting hay are the same activities for which Snap gave
permission to Dyer while they were neighbors. 
“The rule is well settled that use by express or implied permission or
license, no matter how long continued, cannot ripen into an easement by
prescription, since user as of right, as distinguished from permissive user, is
lacking.”  Othen v. Rosier, 226 S.W.2d 622, 626 (Tex. 1950) (internal
quotation omitted).  Further, Dyer’s
activities, including his construction of a new fence, are consistent with his
rights as a co-tenant.  See Todd, 365 S.W.2d at 160 (“Any co-tenant
has a right to be in the possession of property in which he owns an interest,
hence if the acts of the respondents and their predecessors in title are
susceptible of explanation consistent with the existence of the common title
then such acts cannot be such as to give constructive notice to the co-tenants
out of possession.”); Rau, 383 S.W.2d
at 959 (replacement of older fence that “wasn’t too good a fence” was “inconsistent
neither with tenancy nor possession which is presumed in right of common title
for the joint benefit of all tenants in common.”).  Finally, we defer to the jury’s
reconciliation of the testimony from Dyer’s witnesses that no one saw the
co-tenants using the property during this period in contrast with the Venters
heirs themselves describing their usage. 
See Eberle, 73 S.W.3d at 327.  The record, as a whole, shows that the jury’s
finding of no adverse possession is not against the great weight and
preponderance of the evidence.  

II.      Admission of Evidence of Other Litigation
and Closing Argument Rulings

Dyer contends that the trial court
erred by failing to “take appropriate curative action” when Cotton’s counsel
asked questions of witnesses concerning and discussed, during closing argument,
Dyer’s involvement in prior adverse possession lawsuits.  Dyer contends that the evidence of other
adverse possession lawsuits is not relevant to whether he adversely possessed
the property at issue in this case, and its probative value was substantially
outweighed by the danger of unfair prejudice, confusion of issues, and
misleading the jury.  Dyer does not
specifically contend that the statements made during closing argument were
incurable.

The purpose of a motion in limine
is to prevent the opposing party from asking questions to elicit or otherwise
introducing unfairly prejudicial evidence without first approaching the bench
for a formal ruling.  Fort Worth Hotel Ltd. P’ship v. Enserch
Corp., 977 S.W.2d 746, 757 (Tex. App.—Fort Worth 1998, no pet.) (citing Hartford Accid. & Indem. Co. v.
McCardell, 369 S.W.2d 331, 335 (Tex. 1963)).  When the trial court grants a motion in
limine, the opposing party has a duty to comply with the ruling and instruct
the witnesses to do so as well.  Onstad v. Wright, 54 S.W.3d 799, 805
(Tex. App.—Texarkana 2001, pet. denied). 
When a trial court instructs the jury to disregard violative evidence,
we review that evidence to determine whether an instruction to disregard can
cure its admission.  Enserch Corp., 977 S.W.2d at 757 (citing Dove v. Dir., State Employees Workers’ Comp. Div., 857 S.W.2d 577,
580 (Tex. App.—Houston [1st Dist.] 1993, writ denied)).  

A.      Testimony about other litigation

Dyer contends that Cotton violated
the trial court’s in limine ruling by questioning five witnesses about Dyer’s
adverse possession of the other adjacent tract and his involvement in other
adverse possession lawsuits.  After Dyer’s
former ranch hand testified that Dyer kept equipment on the Venters property,
Cotton asked the ranch hand whether he was aware of a lawsuit regarding the
equipment’s ownership.  The trial court
overruled Dyer’s objection.   Then, when Cotton asked the ranch hand about
whether he prepared for this lawsuit by reviewing his testimony from a previous
lawsuit, the trial court sustained Dyer’s objection on relevancy grounds.  

Keith Neumann, a neighbor who
testified by deposition, also testified for Dyer in a previous lawsuit.  The trial court allowed Neumann’s testimony
regarding a lawsuit involving a fence line and a dispute with other elderly
neighbors, but did not allow any reference to Dyer’s adverse possession of the
tract on the other side of his property. 
Dyer also objected when Cotton asked a witness who had done timber
assessments on Dyer’s property about title disputes on the various tracts Dyer
claimed.  The trial court allowed Cotton
to ask about the timber assessments, but barred him from asking about other
lawsuits.  

Cotton also questioned the Grimes
County Tax Assessor about the properties for which Dyer had sought an
agricultural tax exemption.  The trial
court informed Cotton’s counsel that the question was proper, but warned him
not to consider it as an open door to ask about the adverse possession suit
involving the other property next to Dyer’s. 
When Cotton continued to ask about the taxes Dyer paid and the
exemptions for which he applied, the trial court admonished Cotton that his
questions bordered on “contaminat[ing the] jury with the other lawsuit,” and if
he solicited any testimony from witnesses about the lawsuit, the court “would
take very seriously any motions for a mistrial.”  

Bonnie Armstrong, who provided the
title insurance for Cotton’s purchase of the Venters property, stated that she
knew Dyer had claimed other property under adverse possession in the course of
explaining the exceptions she included in the policy.  The trial court denied Dyer’s request for an
instruction to the jury to disregard that testimony, but it instructed
Armstrong not to mention any other adverse possession lawsuits involving Dyer.  On redirect, Cotton asked the trial court for
permission to ask Armstrong about Dyer’s other adverse possession claims that
might have affected Cotton’s claim to the Venters estate.  The trial court denied this request.  

Dyer asked for an instruction to
disregard only once—when Armstrong testified that she knew Dyer had claimed
other property under adverse possession. 
He did not seek an instruction to disregard the other questions about his
lawsuits and adverse possession claims for different property.  Those questions and the admitted testimony
are not so prejudicial that the trial court could not have remedied their
harmful effect by an instruction to disregard, and the trial court’s denial of
his single request, even if in error, did not cause rendition of an improper
judgment.  See Tex. R. App. P.
44.1.  We hold that the trial court did
not reversibly err by denying Dyer’s requested instruction to disregard.

B.      Closing argument

Dyer complains of Cotton’s
references, in closing argument, to: (1) the “fraud” lawsuit over equipment
ownership; (2) Bonnie Armstrong’s preparation of the title insurance policy for
Cotton knowing of Dyer’s previous legal problems; and (3) a reference to Keith
Neumann’s preparation for his deposition in this case by reviewing his testimony
from another lawsuit “involv[ing] elderly people.”  To preserve for appellate review a complaint
of improper jury argument, the complaining party must object when the argument
occurs, unless the conduct or comment cannot be rendered harmless by proper
instruction.  See Jones v. Rep. Waste Servs. of Tex., Ltd., 236 S.W.3d 390, 402
(Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing Dow Chem. Co., 46 S.W.3d at 241). 
A jury argument is curable if the trial court can eliminate the
argument’s harmful effect by instructing the jury to disregard the
statement.  Id. (citing Otis Elevator Co.
v. Wood, 436 S.W.2d 324, 333 (Tex. 1968)). 
We examine the record to determine whether an instruction to disregard
would have sufficiently remedied the harm. 
Id. at 403.  Rarely will an improper argument so
prejudicially influence the jury such that the trial court cannot cure the
error.  Id. (citing Standard Fire
Ins. Co. v. Reese, 584 S.W.2d 835, 839 (Tex. 1979)).

Dyer objected to the references to
the other lawsuits, but not until after the jury retired to begin
deliberations.  The record does not
establish that Cotton’s closing arguments were incurable so as to warrant a new
trial where no objection or request for a limiting instruction was made.  Because Dyer did not timely object and
request an instruction, we hold that Dyer failed to preserve this contention for
review.  See id.; Tex. R. App. P.
33.1(a)(1).




 

III.     Witness Disclosures and Parol Evidence

Dyer contends that the trial court
erred by allowing Jack Baker, Dyer’s immediate grantor, to testify because (1)
Cotton did not properly disclose Baker as a potential witness during discovery,
and (2) Baker’s testimony regarding his intention to only convey his interest,
and not the entire fee estate, to Dyer violated the parol evidence rule.

A.               
Discovery
disclosure

Dyer contends that the trial court
should have excluded Baker’s testimony because, although Cotton listed Baker as
a potential witness during discovery, he did not list Baker’s location or
telephone number and did not accurately supplement this information when he
learned it on the first day of trial.  We
review the trial court’s decision to admit a witness’s testimony for an abuse
of discretion.  Nat’l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527–28
(Tex. 2000).  

A party may request disclosure of
the name, address, and telephone number of any person with knowledge of
relevant facts.  Tex. R. Civ. P. 194.2(e), 194.3(d).  Parties have a duty to amend or supplement
incomplete or incorrect responses to written discovery.  Id.
193.5(a).  If a party fails to timely
make, amend, or supplement a discovery response, that party may not offer the
testimony of a witness who was not timely identified unless the trial court
finds that (1) good cause exists for the failure to timely make, amend, or
supplement the response, or (2) the failure will not unfairly surprise or
prejudice the other parties.  Id. 193.6(a); Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 913–14 (Tex. 1992)
(applying former Rule 215.5).  This rule
is mandatory, and the only permissible sanction for a violation—exclusion of
the testimony—is automatic, unless the trial court finds good cause or lack of
surprise or prejudice.  Alvarado, 830 S.W.2d at 914.  The party seeking to call the witness bears
the burden of establishing good cause or the lack of unfair surprise or
prejudice, and although the trial court has discretion in determining whether good
cause or lack of unfair surprise exists, the trial court’s finding must be
supported by the record.  Tex. R. Civ. P. 193.6(b); Alvarado, 830 S.W.2d at 913–14.

The purpose of Rule 193.6(a) is “to
require complete responses to discovery so as to promote responsible assessment
of settlement and prevent trial by ambush.” 
Alvarado, 830 S.W.2d at
914.  Although exclusion of testimony is
a harsh consequence for failure to timely disclose or supplement, the good
cause exception allows the trial court to excuse the failure to comply in
“difficult or impossible circumstances.” 
Id.; Harris County v. Inter Nos, Ltd., 199 S.W.3d 363, 368 (Tex.
App.—Houston [1st Dist.] 2006, no pet.). 
The Texas Supreme Court has previously indicated that a party’s good
faith efforts at locating a potential witness can support a finding of good
cause.  See Clark v. Trailways, Inc., 774 S.W.2d 644, 647 (Tex. 1989).

In response to Dyer’s initial request
for disclosure, Cotton listed Baker as a person with knowledge of relevant
facts and a potential witness, but reported his address and telephone number as
“unknown.”  Following voir dire, the
trial court took up Dyer’s objections to Cotton calling Baker as a
witness.  Cotton’s counsel stated that, when
he designated Baker as a potential witness, he did not have Baker’s
address.  Counsel recited the various
efforts he made to locate Baker, including hiring an investigator to
investigate Baker’s whereabouts and making inquiries with various residents of
Grimes County to find out if they knew Baker and where he lived.  Shortly before trial, Cotton’s counsel
learned from title company owner Armstrong that Baker lived in Grimes County,
but that his business took him out of the state for much of the time.  In the hearing on Dyer’s motion to strike, Baker
informed the trial court that he resided in Grimes County but had been absent
for most of the last several years doing title work out of the state.  Shortly after Dyer filed suit in March 2006, Baker
moved to Oklahoma, and had only returned to the area about a month before trial
began.  The trial court could also consider
that (1) Cotton timely identified Baker as a person with knowledge of
relevant facts, (2) Baker’s recollection of the circumstances surrounding the
conveyance to Dyer would be highly relevant to Dyer’s claim, and (3) Dyer,
who was a business acquaintance of Baker, was equally able to investigate and
ascertain Baker’s whereabouts.  Thus, the
trial court properly could conclude that Cotton made a good-faith effort to
locate Baker and that Baker’s testimony would not surprise or unfairly
prejudice Dyer.  On this record, we hold
that the trial court did not abuse its discretion in allowing Baker to
testify.  See Brunelle v. TXVT, Ltd. P’Ship d/b/a Trophy Nissan, 198 S.W.3d
476, 479–80 (Tex. App.—Dallas 2006, no pet.) (holding trial court did not abuse
its discretion in allowing witness to testify where TXVT listed witness on
trial witness list, provided information to appellant stating witness had
knowledge of events, and appellant spoke to witness on day of incident); Rutledge v. Staner, 9 S.W.3d 469, 472
(Tex. App.—El Paso 2000, pet. denied) (concluding that trial court erred when
it refused to allow witness to testify for appellant where appellee would not
be unfairly surprised or prejudiced because appellee had listed same individual
on his potential witness list as person with knowledge of facts).

B.      Violation of parol evidence rule

Dyer also contends that the trial
court erred in allowing Baker’s testimony because his statements regarding conversations
with Dyer prior to executing the deed and his intention to only convey his
1/7th interest violate the parol evidence rule. 
We review de novo parol evidence rulings.  DeClaire
v. G&B McIntosh Family Ltd. P’Ship, 260 S.W.3d 34, 45 (Tex. App.—Houston
[1st Dist.] 2008, no pet.).  We presume
that all prior negotiations and agreements merge into the final deed, and
therefore parol evidence is inadmissible to vary, alter, or supplement the
terms of an otherwise unambiguous deed except to show (1) the deed was induced
by fraud, accident, or mistake, (2) the deed was to become effective only upon
certain contingencies, or (3) if the deed is ambiguous, the parties’ true
intentions differ from those expressed in the agreement.  Id.;
Litton v. Hanley, 823 S.W.2d 428, 430
(Tex. App.—Houston [1st Dist.] 1992, no writ).

Generally, parol evidence is
inadmissible to vary or contradict the terms of an unambiguous deed.  Parol evidence is admissible, however, to
demonstrate that, through fraud, accident, or mutual mistake, the deed does not
reflect the parties’ true intentions.  Atlantic Lloyds Ins. Co. of Tex. v. Butler,
137 S.W.3d 199, 212–13 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).  The parol evidence rule thus does not apply
as a bar when a party alleges that, by reason of a mutual mistake, the
agreement “does not express the real intention of the parties.”  Id. (quoting
Marcuz v. Marcuz, 857 S.W.2d 623, 627
(Tex. App.—Houston [1st Dist.] 1993, no writ)); see also Massey v. Massey, 807 S.W.2d 391, 405 (Tex. App.—Houston
[1st Dist.] 1991, writ denied) (“A spouse who is a party to a deed transaction
may not introduce parol or extrinsic evidence to contradict the express
recitals in the deed without first tendering evidence of fraud, accident, or
mistake.”).  A mutual mistake occurs when
the parties to an agreement have a common intention, but the written contract
does not reflect that intent.  Marcuz, 857 S.W.2d at 627.  

To prove mutual mistake, a party
must show (1) the parties’ true agreement, and (2) that the instrument
incorrectly reflects that agreement because of a mutual mistake.  Butler,
137 S.W.3d at 213.  In his amended
counter-petition, Cotton pleaded fraud, ambiguity, and mistake, and alleged
that Dyer purchased the land from Baker with knowledge of the co-tenancy
relationship.  Cotton offered Baker’s
testimony to establish that the deed purporting to convey the entire fee estate
to Dyer was fraudulent or the result of a scrivener’s error.  Baker testified that, before they finalized
the conveyance, he told Dyer that he did not own a full interest in the
property and did not intend to convey the entire fee estate.  According to Baker’s testimony, therefore,
the deed did not correctly state Baker’s actual interest in the property.  

Baker’s testimony tends to prove
mutual mistake, and therefore, the parol evidence rule does not bar its admission.  We hold that the trial court did not err in
allowing Baker to testify.

CONCLUSION

We hold that (1) the trial court did not abuse its
discretion in instructing the jury on ouster; (2) legally and factually
sufficient evidence supports the jury’s finding of no adverse possession;
(3) Dyer waived his complaint concerning the admission of evidence of
other adverse possession and property dispute lawsuits in which Dyer was
involved; and (4) the trial court did not abuse its discretion in allowing
Baker to testify.  We therefore affirm
the judgment of the trial court.

 

 

                                                                   Jane
Bland

                                                                   Justice


 

Panel
consists of Justices Keyes, Higley, and Bland.

 











[1]
          The court relied on Honea v. Arledge, 120 S.W. 508 (Tex.
Civ. App. 1909, writ ref’d), as “[p]erhaps the best expression
. . . as to the effect of a partition.”  Rep.
Prod. Co. v. Lee, 121 S.W.2d 973, 977 (Tex. 1938).  In Honea,
the Lee court observed that the
partition “proceeding, by its publicity and nature, was so notorious and
adverse that it was sufficient to constitute an ouster of the appellant, and
the court had the right to assume as a matter of law that a disseisin was
thereby accomplished, which, if followed
by the necessary adverse holding, would ripen into a title by
limitation.”  Id. (emphasis added).

 





[2]
          Unlike a general warranty deed,
which expressly binds the grantor to defend against title defects created by
himself and all prior titleholders, the grantor under a special warranty deed
is bound to defend the title only against the claims and demands of the grantor
and all persons claiming through him.  Munawar v. Cadle Co., 2 S.W.3d 12, 16
(Tex. App.—Corpus Christi 1999, no pet.). 
Thus, the recordation of the special warranty deed does not, by itself,
provide notice to the co-tenants of Dyer’s adverse claim to the entire
property.